Thomas **RAMSEY**, Respondent,

v.

**THE BURLINGTON NORTHERN AND SANTA FE RAILWAY COMPANY, Appellant.**

No. ED 82534.

Missouri Court of Appeals, Eastern District, Division Two.

Feb. 3, 2004.

Application for Transfer to Supreme Court Denied March 22, 2004.

Application for Transfer Denied April 27, 2004.

648

· William Brasher, St. Louis, MO, for appellant.

Roger Denton, St. Louis, MO, for respondent.

## OPINION

GLENN A. NORTON, Presiding Judge.

The Burlington Northern and Santa Fe Railway Company ("BNSF") appeals the judgment entered on the jury's $1.4 million verdict in favor of Thomas Ramsey on his FELA claim. We affirm in part and reverse in part.

## I. BACKGROUND

Ramsey was a locomotive engineer for BNSF. On January 31, 2000, he reported to the BNSF yard shortly after 1:00 a.m. to take a coal train to an electric plant. It was a very cold morning—between 23 and 28 degrees—and there was precipitation on the ground at the yard. The weather and associated safety hazards were discussed. Under BNSF's rules, locomotive engine walkways are supposed to be free of slipping hazards like ice and snow. It is the maintenance department's job to remove ice and cure any defects in and around the engines when the locomotives are in the yard. But there is not always someone from that department on duty at the yard; in those situations, the engineer and conductor are responsible for removing ice and snow. Calcium chloride and salt are kept at the yards for that purpose. BNSF also had a program to put calcium chloride containers on several thousand of its locomotives, including the one Ramsey was operating that day, but the container had not yet been installed on that locomotive.

On that morning, Ramsey checked to make sure everything onboard the engine was working properly and he inspected the

outside of the train. Ramsey did not see any ice or snow. The conductor also said he was keeping an eye out for ice, but did not recall seeing any before they left. Ramsey and the conductor boarded the engineer side of the locomotive; they both said they would not have been on the conductor side before leaving the yard. They waited over an hour after boarding before they received the signal to depart.

During the trip, there was no ice, snow, rain, or sleet, but it was still very cold. When they arrived at the plant at about 4:00 a.m., the plant's switch was packed with ice and snow, preventing them from parking the train in its normal place for unloading the coal. Instead, the conductor got off the train on the engineer's side and into a transportation van to help guide the train as Ramsey backed it up and parked it in an unlit area.

After the train was parked, the van came around to the conductor's side of the locomotive to pick up Ramsey and the luggage. Ramsey had already taken one piece of luggage off the engine and got back on to collect the rest. As he started to get off again, the conductor offered to help. When Ramsey attempted to hand down a piece of luggage to the conductor, he fell on the walkway of the engine. As he was lying there, Ramsey felt with his hand that there was ice on the deck. He had not seen it before and could not see it then. The light that normally illuminated the walkway was burnt out that morning, and it was still dark outside.

After he helped Ramsey into the van, the conductor went back to the train. He could not see anything in the dark or with the use of his lantern, but he felt with his foot "a slick patch of ice, and it was basically black ice, what you would see on a road from melted precipitation, then re-

freezing.... [I]t was not visible to the eye, especially at night. It wasn't white. It was just clear, and it was the same color as the deck of the engine." The conductor described the patch as six to eight inches wide and a foot long. BNSF's inspection of the train later that day revealed wet spots on the walkway, but no ice.

The fall caused a disc abnormality in Ramsey's back, for which he underwent surgery. The surgery decreased the pain, but he still experiences pain and discomfort from standing or sitting too long. It was recommended that Ramsey find work outside the railroad. At the time of trial, he was working part-time in a piano restoration shop.

Ramsey sued BNSF under the Federal Employers' Liability Act.[1] At trial, evidence of Ramsey's recent past wages was admitted, along with the amounts he paid in state and local income taxes. The trial court excluded evidence of the railroad retirement taxes Ramsey had paid and of the disability benefits Ramsey was receiving from BNSF. After plaintiff's case and again at the close of all evidence, BNSF moved for directed verdict based on the lack of any evidence that the railroad had knowledge of the ice on the deck. That motion was denied, and the jury returned its verdict in favor of Ramsey for $1.4 million. BNSF moved for new trial and to amend the judgment to reflect an offset for paid medical bills. These post-trial motions are deemed denied under Rule 78.06 because they were never ruled on. BNSF appeals.

## II. DISCUSSION

### A. Liability

In its first point, BNSF argues that it should have been granted a directed verdict.

---

1. His claim that BNSF also violated the locomotive inspection act was disposed of on di-

dict because there was no evidence that the railroad knew or should have known about the ice on the deck.

■ We review the trial court's denial of a motion for directed verdict to determine whether the plaintiff made a submissible case. *Erdman v. Condaire, Inc.*, 97 S.W.3d 85, 88 (Mo.App. E.D.2002). Granting a directed verdict is a drastic action that should be taken only when reasonable persons could not differ on the correct disposition of the case. *First State Bank of St. Charles, Missouri v. Frankel*, 86 S.W.3d 161, 169 (Mo.App. E.D.2002). In making this determination, we view the evidence and all reasonable inferences therefrom in the light most favorable to the plaintiff. *Erdman*, 97 S.W.3d at 88. We presume the plaintiff's evidence is true and disregard any contrary evidence. *Id.*

■ To make a submissible FELA case, the plaintiff must show that (1) the railroad had a duty to provide a reasonably safe work place, (2) the railroad's lack of care played some part, however slight, in producing the injury and (3) the injury was reasonably foreseeable. A "reasonably safe workplace" means that the employer is required to remove those dangers that can be removed by the exercise of reasonable care. *Qualls v. St. Louis Southwestern Railway Co.*, 799 S.W.2d 84, 86 (Mo. banc 1990). "Congress vested the power of decision in these actions exclusively in the jury in all but the infrequent cases where fair-minded jurors cannot honestly differ whether fault of the employer played any part in the employee's injury." *Rogers v. Missouri Pacific Railroad Co.*, 352 U.S. 500, 510, 77 S.Ct. 443, 1 L.Ed.2d 493 (1957). Thus, a FELA case should be submitted to a jury if there is *any* evidence, however slight, to support the employer's negligence. *Euton v. Norfolk & Western Railway Co.*, 936 S.W.2d 146, 150 (Mo.App. E.D.1996).

■ To satisfy the foreseeability element in a FELA case, the plaintiff must show that the railroad had actual or constructive notice of the defective condition that caused his injury. *Id.* at 151. Foreseeability is demonstrated by evidence that (1) the railroad was responsible, through negligence, for the presence of the unsafe condition, or (2) the railroad had actual knowledge of its presence before the accident, or (3) the unsafe condition had continued for a sufficient length of time to justify an inference that failing to know about and remove it was due to lack of proper care. *Id.* The railroad's knowledge or anticipation of the possibility that a general danger is present and that its standard of conduct is inadequate to protect its employees from that harm is all that is required to satisfy this element. *House v. Missouri Pacific Railroad Co.*, 927 S.W.2d 538, 540 (Mo.App. E.D.1996).

■ Here, there was sufficient evidence under the liberal standards in FELA cases to show that BNSF knew or should have known that, based on the weather conditions, there could have been ice or snow on the deck of Ramsey's locomotive. It is reasonable to infer that the ice was present on that train when it left the yard—there was precipitation on the ground there, and no other precipitation occurred during the trip. The "black ice" was not visible, but a jury could reasonably infer that if BNSF had sufficiently staffed the yard, then an inspection by the maintenance department may have revealed the presence of ice. Likewise, given that this type of ice is formed from melting and refreezing, it is reasonable to infer that *visible* ice or snow was present at some point, which a jury could conclude was a condition that BNSF could have remedied with ordinary caution. Moreover, evidence that BNSF had instituted a program to equip

locomotives with calcium chloride and that they had a rule requiring walkways to be free of slipping hazards demonstrates that it knew that ice was a hazard on locomotives. "The possibility of injury from a condition in the work place is what must be reasonably foreseeable, not knowledge of the precise injury and location." *Sanders v. National Railroad Passenger Corp.*, 930 S.W.2d 36, 38 (Mo.App. E.D.1996); *see also Bailey v. Norfolk and Western Railway Co.*, 942 S.W.2d 404, 411 (Mo.App. E.D.1997) (reasonably foreseeable that combination of conditions would adversely affect plaintiff's rest and could cause injury because possible health consequences of inadequate rest had long been available to railroad industry). Reasonable people could differ as to whether the railroad took sufficient care to protect Ramsey from the possibility of harm by this known hazard.

This is simply not one of "the infrequent cases where fair-minded jurors cannot honestly differ whether fault of the employer played any part in the employee's injury." *Rogers*, 352 U.S. at 510, 77 S.Ct. 443. The case was submissible, and the motion for directed verdict was properly denied.

Point I is denied.

### B. Railroad Retirement Taxes

In point two, BNSF argues that the court erred by refusing to exclude evidence of the railroad retirement taxes Ramsey paid because only after-tax income can be used to calculate future wage loss. We will not disturb the trial court's decision regarding the admission of evidence absent a clear abuse of discretion. *Fairbanks v. Weitzman*, 13 S.W.3d 313, 318 (Mo.App. E.D.2000). We find no abuse of discretion here.

BNSF relies on *Norfolk and Western Railway Company v. Liepelt*, in which the United States Supreme Court held that

evidence showing the effect of income taxes on the plaintiff's future earnings is relevant to the calculation of his future wage loss. 444 U.S. 490, 493–95, 100 S.Ct. 755, 62 L.Ed.2d 689 (1980). It is the plaintiff's after-tax income, not his gross income, that is the proper measure of damages. *Id.* at 493. *Liepelt* involved only income taxes, however, and not railroad retirement taxes, which are of a different character. *See Maylie v. National Railroad Passenger Corp.*, 791 F.Supp. 477, 487 (E.D.Pa.1992) (*Liepelt* inapplicable to railroad retirement taxes), *aff'd* 983 F.2d 1051 (3rd Cir.1992). Railroad employees and employers pay these taxes into an annuity fund from which the Railroad Retirement Board, in accordance with the Railroad Retirement Act, administers disability and retirement annuities for eligible employees. *See* 45 U.S.C. section 231, *et seq.*; 26 U.S.C. sections 3201 and 3221. Part of the taxes is paid toward the disability and retirement annuities that supplant social security for railroad employees, and part is paid toward the annuity fund's pension component.

Because railroad retirement taxes are more akin to social security taxes than income taxes, BNSF also cites to *Madore v. Ingram Tank Ships, Inc.*, in which the Court held that under *Liepelt* social security taxes should be deducted from a Jones Act plaintiff's lost income stream. 732 F.2d 475, 478–79 (5th Cir.1984). But the Court in *Madore* also expressly noted that a deduction for such taxes could be disregarded if there is some "articulated reason" to do so. *Id.* at 479. We think there is an articulated reason in this case, as expressed in *Maylie.*

In *Maylie*, the plaintiff presented evidence of his lost benefits, but did not include the contingent value of his pension. 791 F.Supp. at 488. The court held that where a plaintiff is not seeking lost rail-

road retirement benefits, railroad retirement taxes—which represent his contribution toward those benefits—should not be deducted:

> The value that the jury placed on plaintiff's lost future wages and benefits, therefore, did not include the value of his lost railroad retirement pension. It would be inappropriate to deduct from plaintiff's lost salary taxes that, in effect, represented plaintiff's contribution toward a pension without including, as an item of damages, the value of that pension. Because defendant did not consent to inclusion of the value of the pension as an item of damages, it was not error to refuse to reduce plaintiff's lost wages by the amounts he would have had to pay in railroad retirement taxes.

*Id.*

Here, Ramsey sought compensation for his lost future salary, unpaid medical bills and pain and suffering. He made no claim for lost retirement benefits. Thus, it was not an abuse of discretion to refuse the admission of what he would have had to pay in railroad retirement taxes. The other cases on which BNSF relies are distinguishable because those plaintiffs sought compensation for lost future retirement benefits. *Rachel v. Consolidated Rail Corp.*, 891 F.Supp. 428 (N.D.Ohio 1995); *Adams v. Burlington Northern Railroad Co.*, 865 S.W.2d 748 (Mo.App. W.D.1993).[2]

Point II is denied.

## C. Disability Benefits

■ In its third point, BNSF contends that the court erred by excluding evidence that Ramsey was receiving monthly railroad disability benefits.[3] Again we find no abuse of discretion as to this evidentiary ruling. *See Fairbanks*, 13 S.W.3d at 318.

In *Eichel v. New York Central Railroad Co.*, the Supreme Court held that evidence that the plaintiff was receiving disability payments under the Railroad Retirement Act was inadmissible. 375 U.S. 253, 254–55, 84 S.Ct. 316, 11 L.Ed.2d 307 (1963). The Court noted that those benefits "are not directly attributable to the contributions of the employer" and are "inadmissible to offset or mitigate damages." *Id.* at 254, 84 S.Ct. 316. Moreover, in that case, the likelihood of misuse by the jury clearly outweighed any value such evidence of "collateral social insurance benefits" would have had in showing plaintiff's motive for not continuing to work. *Id.* at 254–55, 84 S.Ct. 316.[4]

---

**2.** In *Rachel*, the railroad sought to prevent plaintiff's expert from including retirement taxes as "fringe benefits" in his projected loss of earnings. 891 F.Supp. at 429. The court noted plaintiff's right to seek damages that reflect the loss of the larger annuity he would have received had he not been injured and had continued working at the railroad until his natural retirement. *Id.* at 429–30. But it found that the parties' tax contributions do not fairly represent the value of that loss and, therefore, plaintiff could not rely on those taxes as evidence the lost benefit. *Id.* at 430. Rather, evidence of the value of lost pension benefit should be calculated under the Railroad Retirement Act. *Id.* In *Adams,* the court held—in the context of the curative admissibility doctrine—that the employer's portion of retirement taxes would not have been admissible, upon proper objection, to prove the value of lost retirement benefits. 865 S.W.2d at 751.

**3.** Ramsey notes that BNSF's offer of proof at trial on this point was insufficient. We will consider the point *ex gratia.*

**4.** BNSF argues in its brief that the Court in *Eichel* misunderstood the nature of railroad disability benefits; it claims that the rationale for the collateral source rule does not apply to these benefits since they are "primarily" funded by the railroad. The railroad made the same argument in *Giddens v. Kansas City Southern Railway Co.*, which our Supreme Court found was "foreclose[d]" by *Eichel.* 29

But if the plaintiff raises his financial condition and implies poverty or alludes to financial distress, then the defendant may rebut that evidence "by showing that other financial assistance was available." *Moore v. Missouri Pacific Railroad Co.*, 825 S.W.2d 839, 842–43 (Mo. banc 1992) (citing *Gladden v. P. Henderson & Co.*, 385 F.2d 480 (3rd Cir. 1967) and *Lange v. Missouri Pacific Railroad Co.*, 703 F.2d 322 (8th Cir.1983)); *see also Leake v. Burlington Northern Railroad Co.*, 892 S.W.2d 359, 363 (Mo.App. E.D.1995). In *Moore*, the Court approved admission of plaintiff's disability benefits when he injected his financial distress into the case by testifying that he could not afford to continue therapy. *Id.* at 842, 843. In *Gladden*, the plaintiff testified that the main reason he went back to work was to catch up on bills and support his family. 385 F.2d at 482. In *Lange*, the plaintiff claimed he was forced to return to work immediately after surgery because he had no money. 703 F.2d at 324.

Here, BNSF argues that Ramsey opened the door to admission of disability benefits by allegedly testifying in deposition before trial that he was seeking only volunteer work so as not to affect those benefits. This argument is wholly without merit, factually and legally. First, Ramsey did not testify as BNSF claims he did during his deposition. In fact, he expressly stated that the disability benefits had *not* prevented him from looking for a paying job, that he had made attempts to find a job and that he would rather be working. Ramsey made the statement to which BNSF refers in response to being asked if he planned to volunteer a few hours a week after finishing his hospice training: " . . . I'm planning on doing that. It won't affect my disability, you know, and I'm still busy." This statement does not imply poverty or allude to financial distress to evoke sympathy from the jury or increase the award. *See Leake*, 892 S.W.2d at 363. Not only does the statement lack any implication of Ramsey's financial condition, but it was made in a deposition that was not even offered into evidence or presented to the jury at trial. Thus, regardless of its meaning, it cannot be said to have opened the door to rebuttal evidence of Ramsey's disability benefits.

BNSF also claims that the disability benefits were admissible to rebut inclusion of the railroad retirement taxes in Ramsey's wage loss computation. The inclusion of that tax information in a damages computation is not analogous to the introduction of financial hardship evidence and does not open the door to collateral source evidence. *Adams*, 865 S.W.2d at 751. Nor is it admissible under the doctrine of curative admissibility. *Id.* at 751–52.

Point III is denied.

## D. "After–Tax Income" Instruction

The trial court gave the jury Missouri Approved Instruction 8.02 regarding damages, which includes the statement that any award "is not subject to income tax." The court refused the following non-MAI instruction submitted by BNSF: "The measure of plaintiff's wage loss must be calculated from his after[-]tax income."

"[T]he propriety of jury instructions concerning the measure of damages in an FELA action is an issue of 'substance' determined by federal law." *St. Louis Southwestern Railway v. Dickerson*, 470 U.S. 409, 411, 105 S.Ct. 1347, 84 L.Ed.2d 303 (1985). Accordingly, a party's

S.W.3d 813, 824 (Mo. banc 2000); *see also Rachel*, 891 F.Supp. at 430–31 (relying on *Eichel* to reject similar argument). We agree.

contention that it is entitled to an instruction cannot be dismissed solely on the ground that the instruction is not found in MAI. *Id.; see also Kauzlarich v. Atchison, Topeka, and Santa Fe Railway Co.,* 910 S.W.2d 254, 257 (Mo. banc 1995); *Wilson v. Consolidated Rail Corp.,* 875 S.W.2d 178, 182 (Mo.App. E.D.1994). "Whether such an instruction should have been given is a federal question." *Dickerson,* 470 U.S. at 411, 105 S.Ct. 1347.

■ Ramsey contends that MAI 8.02 as given is a correct and complete statement of the applicable law and, thus, no other instruction on the same subject can be given under Rule 70.02(b). BNSF argues that MAI 8.02 alone is insufficient under *Liepelt* because it only instructs the jury that its award is not taxable and fails to explain that taxes should not be included in the jury's calculation of Ramsey's lost future wages. In *Liepelt,* in addition to holding that income taxes were relevant and admissible for purposes of figuring plaintiff's future wage loss, the Supreme Court also held that it was error not to instruct the jury that its award would not be subject to any income tax. 444 U.S. at 496–98, 100 S.Ct. 755. MAI 8.02 reflects that holding. But the Court said nothing about instructing the jury about deducting income taxes from wage loss calculations; the holding regarding instructions dealt only with the taxability of the jury's award. *Liepelt* does not require that courts give the instruction BNSF proposes here, and BNSF has pointed to no other federal authority that does.

■ Moreover, even if BNSF was entitled to an instruction that Ramsey's future wage loss should be calculated based on after-tax income, BNSF has not shown any prejudice by the court's refusal to give that instruction in this case. Error in failing to give an instruction to which a party is entitled only warrants reversal if the merits of the action have been materially affected. *Giddens,* 29 S.W.3d at 819. First, of course, there can be no prejudice resulting from the failure to instruct the jury not to include railroad retirement taxes in its calculation of Ramsey's future wage loss since we have found that those taxes were not admissible in this case. Second, the amounts Ramsey paid in federal and state income taxes were introduced into evidence, and counsel for both parties argued for the jury to use Ramsey's after-tax income to determine his lost future wages. BNSF has pointed to nothing in the record to support the conclusion that because its instruction was not given the jury disregarded the evidence and arguments and included income taxes in its award.

Point IV is denied.

**E. Excessive Verdict**

■ BNSF argues that the verdict is excessive due in part to the alleged evidentiary and instructional errors that we have disposed of above. It also contends that improper testimony regarding the purpose of the railroad's safety rules resulted in an excessive verdict meant to punish BNSF. BNSF objected to the "line of questioning" regarding the safety rules, but did not cite any legal basis for the objection and, in any case, the objection was sustained and the line of questioning ended. BNSF did not move to strike any of the testimony that had already been given by the time its objection was made. We decline to review the excessiveness of this verdict based on this unpreserved alleged error. *See Graham v. County Medical Equipment Co., Inc.,* 24 S.W.3d 145, 149 (Mo.App. E.D. 2000).

Point V is dismissed.

### F. Offset for Medical Expenses

■ In its final point, BNSF contends that it is entitled to an offset for the medical expenses it has paid under the railroad's Health and Welfare plan. We agree.

■ In any FELA action, the railroad "may set off therein any sum it has contributed or paid to any insurance, relief benefit, or indemnity that may have been paid to the injured employee or the person entitled thereto on account of the injury or death for which said action was brought." 45 U.S.C. section 55. Setoff is permitted under this section for payments of benefits intended to indemnify an employer against liability under the FELA, but not for those fringe benefits that compensate employees for their work. *Folkestad v. Burlington Northern, Inc.,* 813 F.2d 1377, 1381 (9th Cir.1987); *Clark v. Burlington Northern, Inc.,* 726 F.2d 448, 450 (8th Cir.1984). The Health and Welfare Agreement between BNSF and its employees provides that any payment of benefits thereunder "will satisfy any right of recovery against the employing railroad for such benefits to the extent of the benefits so provided" and "will be offset against any right of recovery the employee may have against the employing railroad for hospital, surgical, medical or related expenses...." The Ninth Circuit has held that "[t]he railroads and the unions have thus agreed that benefits under the plan will satisfy FELA liability and that setoffs ... should be allowed." *Folkestad,* 813 F.2d at 1379. The purpose of this coverage clearly is to indemnify the employer against FELA liability, and payments made under the plan should be set off in accordance with 45 U.S.C. section 55. *Id.* at 1383; *see also Clark,* 726 F.2d at 450–51; *Burlington Northern Railroad Co. v. Strong,* 907 F.2d 707, 713–14 (7th Cir.1990).

Point VI is granted.

### III. CONCLUSION

The judgment is affirmed, except as to the amount of the judgment. The case is remanded with instructions to reduce the judgment by the amount of benefits Thomas Ramsey received under the Health and Welfare plan.

KATHIANNE KNAUP CRANE, J. and MARY K. HOFF, J. concurring.