Ronald W. RICE, Appellant,

v.

BNSF RAILWAY COMPANY, Respondent.

No. SD 30895.

Missouri Court of Appeals,
Southern District,
Division Two.

July 29, 2011.

---

Kenneth E. Rudd, St. Louis, MO, for Appellant.

Laurel E. Stevenson, Springfield, MO, for Respondent.

WILLIAM W. FRANCIS, JR., Presiding Judge.

Ronald W. Rice ("Rice") brought suit under the Federal Employers' Liability Act ("FELA") against his former employer, BNSF Railway Company ("BNSF"), for injuries arising out of BNSF's alleged negligence. Rice appeals the trial court's directed verdict in favor of BNSF following the close of Rice's evidence. We reverse and remand.

### Factual and Procedural History

On May 12, 2009, Rice filed a petition for damages claiming he sustained permanent and cumulative injuries, including bilateral carpal tunnel syndrome and neck and lower back injuries, from BNSF's failure to provide adequate work methods, conditions, equipment, and training to perform his assigned duties as a BNSF employee. Rice further alleged he did not know, nor did he have reason to know, of his separate injuries or that the injuries were related to his work until after June 1, 2006, less than three years before suit was commenced. In the course of the jury trial, beginning on September 20, 2010, the following evidence was adduced.

### Rice's Employment With BNSF

On August 8, 1974, BNSF[1] hired Rice as a trackman in the "Maintenance-of-Way" department. Rice worked at various locations as a trackman for BNSF for over thirty-three years. The focus of Rice's lawsuit, however, was primarily related to Rice's work on the BNSF's "Regional Production 13" ("RP–13") rail gang from 1999 until 2007. The RP–13 rail gang was a production gang that operated like an assembly line, putting in and replacing rails. As a member of the RP–13 rail gang, Rice performed basic trackman duties, but his primary job was that of a "hooker" for the Grove crane.

As part of Rice's basic trackman duties he would, at the beginning and end of each day, manually pull spikes with a claw bar and manually re-drive spikes with a spike maul. The claw bar Rice used to pull spikes was a 5–foot–long steel bar weighing 40 pounds. Pulling a spike with a claw bar requires "quite a bit of force." To pull the spike, Rice would put the foot of the claw bar under the spike and push down on the opposite end of the bar with both hands "like you were going to pull a nail with a hammer only it's on a much bigger scale." At first the wrists are pretty straight, but as the claw bar is pushed down, the wrists bend over the top of the claw bar. When using the claw bar, a person's back starts in the upright position, "but as you're pulling [the] spike, you

---

1. Rice was originally hired by the St. Louis–San Francisco Railway Company ("Frisco"), which in 1980, merged with the Burlington Northern Railroad ("BNR"). Following the 1995 merger between BNR and the Atchison, Topeka & Santa Fe Railway Company, the merged company was initially known as the Burlington Northern Santa Fe Railway and later changed its name to the BNSF Railway Company.

go over to a bent over position at the waist...." Sometimes a "violent motion" was required to get the spikes out of the railroad tie.

On December 4, 2000, Rice underwent BNSF's "Backs Plus" safety and ergonomics training program. BNSF's *Backs Plus 2000* literature—developed by its own engineering department—indicated that at least since the year 2000, hydraulic spike pullers were the preferred method for removing spikes. Hydraulic spike pullers provided an alternative to using the claw bar to manually pull spikes. By squeezing the handle of the hydraulic spike puller, it would release the "pinchers" which pulled the spike out. Co-worker John Wadlow ("Wadlow") testified that the RP–13 rail gang had a quality cart, which had a hydraulic spike puller on it, but it was never working. Rice confirmed that the RP–13 rail gang did not use a hydraulic spike puller.

As a Grove crane hooker Rice helped build rail joints using a rail saw, a hydraulic rail drill, and a hydraulic impact wrench. Rice used the rail saw to cut between 10 and 20 sections of rail each day; each cut took approximately a minute and a half. Use of the rail saw caused a tremendous amount of vibration in the hands and arms. After using the rail saw, Rice's hands "would tingle and sometimes be numb afterwards." This was a frequent occurrence and depended upon how many cuts Rice made. Rice also used the hydraulic rail drill to drill between 40 and 80 holes through the web of the rail each day. The rail drill was handheld and also vibrated. Rice used the hydraulic impact wrench to tighten and untighten rail bolt nuts; he tightened between 40 and 80 bolts a day. The hydraulic impact wrench also vibrated and jerked as soon as you pulled the trigger.

In 1995, while working for BNSF at the "Switch Panel Plant" in Springfield, BNSF provided Rice with anti-vibration gloves for use while cutting rail. Rice testified the anti-vibration gloves made a difference and there was a lot more vibration without the anti-vibration gloves.[2] In 1999, after Rice went to work as the Grove crane hooker on the RP–13 rail gang, he requested anti-vibration gloves from a BNSF fuel truck driver, whose job it was to supply fuel, oil, gloves and safety equipment. Rice specifically asked the driver for anti-vibration gloves, but never received any. Co-workers Wadlow and Richard Jones ("Jones") confirmed they too never received any anti-vibration gloves while working on BNSF's RP–13 rail gang.

Assistant Roadmaster Ed Blackburn ("Blackburn") testified the RP–13 rail gang was intended to be staffed with thirty-five men. BNSF, however, cut the crew back to thirty-two. As the Assistant Roadmaster, Blackburn received numerous complaints about lack of manpower. Blackburn took those complaints to his immediate supervisor, Calvin Bray ("Bray"). Blackburn complained to Bray that more help was needed on the crew. According to Blackburn, Bray took the complaints to his superiors. Ultimately, however, Bray instructed Blackburn he would have to make do with the men he had.

Rice was heard making complaints about needing help with his work. Complaints were made to the roadmaster or the foremen during job briefings. The RP–13 rail gang "pretty much worked short-handed every day." Sometimes they were three-to-four men short. Jones complained personally to the foremen and the roadmasters about being short-handed.

**2.** Richard Jones, the tamper operator on the RP–13 rail gang, agreed that the anti-vibra- tion gloves took some of the impact off the hands when using the equipment.

During the final three-to-four years Rice worked for BNSF, he only received help about 20 to 25 percent of the time.[3] The rest of the time Rice performed the work without the requested help. Blackburn explained that when he supervised Rice (1999 to 2001), the Grove crane hooker job had more lifting and was more strenuous than any other job on the BNSF RP–13 rail gang. According to Blackburn, no one on the BNSF RP–13 rail gang needed assistance more than Rice. Blackburn testified Rice would tell him he was tired and needed help. Blackburn testified that if he had been given the additional three men he had requested, he would have been in a position to occasionally give Rice more help. Rice explained that when he actually got help, the job was easier, not as strenuous, and he was not "nearly as tired at the end of the day."

The Grove crane that Rice used had a defective guide wheel; complaints were made to the foremen, roadmasters, and mechanics. Jason Phillips, Rice's co-worker and fellow trackman, testified he asked for four years (two of those years working with Rice) that the Grove crane guide wheel be fixed, but it was never fixed. When the guide wheel malfunctioned and the boat derailed, Rice, Phillips, and Jones had to re-rail it, which "cause[d] a lot of extra work . . . ."

### Symptoms and Medical Treatment

Rice testified he first noticed symptoms of carpal tunnel syndrome ("CTS") in August or September 2007. He began waking up at night with numbness and tingling in his hands and was unable to fall back asleep. These symptoms prompted him to see his primary care physician, Dr. Tegtmeyer, in January 2008. Dr. Tegtmeyer referred Rice to Dr. Edwin Cunningham

("Dr. Cunningham"), a board certified neurosurgeon.

Rice's initial visit with Dr. Cunningham was on March 5, 2008. During Dr. Cunningham's treatment and evaluation of Rice, Dr. Cunningham discussed with Rice his employment and made notes in his records—in the original history and physical. Dr. Cunningham diagnosed Rice with CTS. An electromyogram/nerve conduction study ("EMG/NCS") demonstrated mild sensory motor neuropathy on the right, and sensory abnormality in the left median nerve. Dr. Cunningham expressly testified that Rice "had electrical findings suggesting that which fit with what [Rice] was telling me in history." In Dr. Cunningham's opinion, Rice's complaints, history and electrical findings were consistent.

Dr. Cunningham explained that the carpal tunnel is a little bony and ligamentous tunnel that is at the base of the wrist and through that little bony tunnel, travel multiple tendons that work with the fingers that flex the fingers or bend them up. A couple of small arteries and most importantly in terms of problems for patients, a specific nerve called the median nerve which is fairly sizable.

Dr. Cunningham went on to explain that the process of aging, and other factors such as repetitive use of the finger flexors, can progressively narrow the tunnel and push on the nerve, causing pain and numbness. Rice initially thought he could live with the pain but returned for additional care and treatment in September 2009. Rice subsequently underwent two surgeries for CTS.

A hypothetical question was posed to Dr. Cunningham during trial regarding

---

**3.** BNSF Safety Rule 1.2.7 provides in part: "Don't perform a task alone that can only be performed by two or more people."

whether Rice's work with BNSF contributed to his CTS and his low back injuries. Dr. Cunningham responded:

A. I think it's possible with that kind of repetitive behavior using his hands that it most likely did contribute. It's hard for me to assign a percentage to it, but it did contribute in particular to the carpal tunnel syndrome.

Q. And would that be a yes?

A. Yes.

Dr. Cunningham also testified that in his opinion, to a reasonable degree of medical certainty, Rice's CTS was related to his work. This was based on his discussion with Rice, his clinical evaluation of Rice, and the EMG/NCS results. Dr. Cunningham recalled discussing with Rice his number of years of heavy manual labor and the repetitive daily grind.

Rice also complained of lower back pain at his initial appointment with Dr. Cunningham. Dr. Cunningham testified Rice reported a history of worsening low back, lumbar symptoms for six months. Rice told Dr. Cunningham that in retrospect, his back pain had been bothering him for years. Rice was also diagnosed with lumbar spondylosis. Dr. Cunningham testified that repetitive loading and unloading of the spinal joints with a weight even greater than an individual's own body weight, can cause it. Repetition plays a role, "but in particular [it is] the loads. A lot of us will change positions frequently during the day, but if it's under a significant load multiple times per day, that can have an effect."

Dr. Cunningham testified that in his opinion, to a reasonable degree of medical certainty, Rice's work activities contributed to his CTS, his lumbar spondylosis, and his low back pain.[4] However, at another point, Dr. Cunningham also testified he could not say to a reasonable degree of medical certainty, one way or the other, that Rice's lumbar spondylosis and chronic low back pain were the result of his work at BNSF. Additionally, Dr. Cunningham testified he signed an affidavit stating "to a reasonable degree of medical certainty, that [Rice]'s maintenance-of-way work for the railroad contributed significantly to his bilateral carpal tunnel syndrome, his lumbar spondylosis, and his chronic low back pain...."

There was also testimony that Rice had complained to Wadlow, at an unspecified time between "2003 or 2004 to 2007," that Rice occasionally said his back was hurting him or his hands hurt.

At the close of Rice's evidence, BNSF filed a motion for a directed verdict alleging: (1) Rice's claims were barred by the three-year statute of limitations; (2) Rice failed to prove causation for his CTS and back problems as being the result of his work with BNSF; and (3) Rice failed to establish BNSF was or should have been aware of conditions with the Grove crane, tie handling, and other railroad work, which created a likelihood of suffering the types of injuries claimed by Rice.[5] On September 27, 2010, the trial court granted BNSF's motion for directed verdict. The trial court's "Final Order and Judgment" did not state a reason for the trial court's decision. This appeal followed.

■ First, Rice contends the trial court erred in sustaining BNSF's motion for di-

4. A. Yes, it's my opinion that [Rice's work activities] contributed to his carpal tunnel and lumbar spondylosis.
 Q. And would that also have contributed to his low back pain?
 A. Yes.

5. BNSF's motion also alleged Rice failed to establish any economic damages. Nevertheless, neither BNSF nor Rice discussed the issue of economic damages in their briefs; thus, we do not address it.

rected verdict at the close of Rice's evidence in that the evidence was sufficient, under the relaxed standards of FELA, for the jury to infer BNSF breached its duties, that some harm was foreseeable, and that Rice's injuries were caused, in whole or in part, by BNSF's negligence.[6] Rice also contends there was sufficient evidence to present a jury question on the issue of whether Rice filed and commenced his lawsuit within three years of the date he knew, or should have known, of his injuries.

The issues pertinent to our resolution of this appeal are:

1. Did Rice meet his burden in presenting a case submissible to the jury?
2. Was there sufficient evidence that the accrual date of Rice's injuries was within three years of Rice filing his petition?

### Standard of Review

"We review the entry of a directed verdict in a defendant's favor to determine if the plaintiff made a submissible case." *Cupp v. Nat'l R.R. Passenger Corp.*, 138 S.W.3d 766, 771 (Mo.App. E.D.2004). In making this determination, we view the evidence and reasonable inferences in the light most favorable to the plaintiff, disregarding contrary evidence and inferences. *Id.* "We will reverse a verdict directed against a plaintiff unless the facts and inferences weigh so strongly against the plaintiff that there is no room for reasonable minds to differ." *Cabinet Distributors, Inc. v. Redmond,* 965 S.W.2d 309, 312 (Mo.App. E.D.1998).

### Statutory Framework

FELA provides, in part:

Every common carrier by railroad while engaging in commerce ... shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce ... for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment.

45 U.S.C.A. § 51. FELA "was designed to be a broad, remedial statute, eliminating several common-law tort defenses and providing liberal recovery for injured workers." *Briggs v. Kansas City Southern Ry. Co.,* 925 S.W.2d 908, 913 (Mo.App. W.D. 1996). "The enactment of FELA and subsequent United States Supreme Court decisions interpreting it not only broadened the common law duty of a railroad employer, they also increased the decision-making role of the jury." *Id.*

"In a FELA action, federal law governs the determination of whether or not a plaintiff has met his burden in making a submissible case." *Braddy v. Union Pac. R.R. Co.,* 116 S.W.3d 645, 649 (Mo. App. E.D.2003). The test for submissibility is simply whether the proofs justify, with reason, the conclusion that the employer's negligence played any part, however slight, in causing the injury for which damages are sought. *Id.* "It does not matter that the jury could, based on probability, attribute the injury to another cause." *Id.* Therefore, "a FELA case should be submitted to a jury if there is *any* evidence, however slight, to support the employer's negligence." *Ramsey v.*

---

**6.** BNSF urges this Court to dismiss Rice's appeal for failure to adhere to Rule 84.04(e). While we acknowledge deficiencies in Rice's brief, we are able to sufficiently discern Rice's allegations of error without impeding disposition on the merits. *See DeLong Plumbing Two, Inc. v. 3050 N. Kenwood LLC,* 304 S.W.3d 784, 788 (Mo.App. S.D.2010).

*Burlington Northern & Santa Fe Ry. Co.,* 130 S.W.3d 646, 651 (Mo.App. E.D.2004).

■■■■ Even though FELA is liberally construed to provide recovery for injured workers, a railroad's liability must still be based on negligence. *Briggs,* 925 S.W.2d at 913. To make a submissible FELA case, the plaintiff must present some evidence showing: (1) the railroad had a duty to provide him with a reasonably safe place to work; (2) the railroad breached its duty of care; (3) this lack of due care played some part, however slight, in producing the plaintiff's injury; and (4) the injury was reasonably foreseeable. *See Euton v. Norfolk & Western Ry. Co.,* 936 S.W.2d 146, 150 (Mo.App. E.D.1996).

■■■■ While specific standards of care are not stated in FELA, certain employer duties have become integral parts of the statute. *Ackley v. Chicago & N.W. Transp. Co.,* 820 F.2d 263, 266 n. 5 (8th Cir.1987). The applicable duties to the case at hand include: the duty to provide a reasonably safe place to work,[7] *Bailey v. Central Vermont Ry.,* 319 U.S. 350, 352–53, 63 S.Ct. 1062, 87 L.Ed. 1444 (1943); the duty to provide reasonably safe tools and equipment,[8] *Baltimore & O.S.W.R. Co. v. Carroll,* 280 U.S. 491, 496, 50 S.Ct. 182, 74 L.Ed. 566 (1930); and the duty to "provide a sufficient number of employees to perform assigned work," *Wilmoth v. Chicago, R.I. & P.R Co.,* 486 S.W.2d 631, 634 (Mo.1972). Here, Rice primarily alleged BNSF breached the above duties in four respects: (1) failure to provide him with anti-vibration gloves; (2) failure to provide him with a working hydraulic spike puller;

(3) failure to provide sufficient employees to perform assigned tasks; and (4) failure to repair the Grove crane's defective guide wheel.

■■■■ BNSF's motion for a directed verdict did not specifically argue that Rice failed to establish BNSF's duties and breach of those duties. "Although we may affirm the trial court if it is correct on any ground, not just on the grounds given, we do not go beyond the grounds asserted in the motion and briefed on appeal to look for other reasons to affirm." *Cupp,* 138 S.W.3d at 772–73. Thus, the issues for review are whether there was *any* evidence offered as to: (1) the foreseeability of the injuries; (2) the causation of the injuries; and (3) Rice's filing of his claim within the statute of limitations.

### A. Causation.

■■■■ Under FELA, Rice must prove that BNSF's negligence caused his injuries. *Euton,* 936 S.W.2d at 151. "Causation under FELA, however, differs from a 'normal' negligence case because if employer's negligence is the slightest cause of the injury, liability is established." *Id.* Furthermore, recovery under FELA is "appropriate even if the employee's injury was caused by the cumulative effect of a series of incidents." *Id.* Thus, there only need be some evidence, even the slightest, to connect Rice's injuries to some negligent act of BNSF.

In addition to detailed evidence regarding Rice's strenuous daily work on the RP–13 rail gang, Rice introduced testimo-

---

**7.** "A 'reasonably safe work place' means that the employer is required to remove those dangers that can be removed by the exercise of reasonable care." *Cuslidge v. Union Pac. R.R. Co.,* 197 S.W.3d 206, 210 (Mo.App. E.D. 2006).

**8.** If there are two different methods of work or pieces of equipment that could be used to perform a task and an employee is injured performing the task by the method or equipment selected by the railroad, then the issue of whether the alternative method or equipment should have been used is normally one for the jury. *See Stone v. New York, C., & St. L.R. Co.,* 344 U.S. 407, 73 S.Ct. 358, 97 L.Ed. 441 (1953).

ny of his treating physician, Dr. Cunningham. Dr. Cunningham testified that, in his opinion, to a reasonable degree of medical certainty, Rice's work activities contributed to his CTS, his lumbar spondylosis, and his low back pain. Dr. Cunningham explained factors that cause CTS, including repetitive activity. In regard to the cause of lumbar spondylosis, Dr. Cunningham explained that repetition plays a role, but in particular it is the significant loads multiple times per day that can have an effect. Dr. Cunningham's conclusions were based both on his knowledge of Rice's work with BNSF, and a series of hypothetical facts presented to him. Additionally, Dr. Cunningham testified that he signed an affidavit stating "to a reasonable degree of medical certainty, that [Rice]'s maintenance-of-way work for the railroad contributed significantly to his bilateral carpal tunnel syndrome, his lumbar spondylosis and his chronic low back pain . . . ."

 BNSF argues that Dr. Cunningham's testimony did not meet the admissibility standard for medical expert testimony; thus, there was no evidence from which a reasonable juror could find causation. BNSF's argument ignores the fact that the trial court admitted Dr. Cunningham's testimony. Any alleged inconsistencies, incorrect conclusions, or changes in testimony were played out in full in front of the jury, were issues for the jury to resolve, and it was for the jury to give such weight to the testimony as the jury thought it deserved. *See Brandt v. Pelican*, 856 S.W.2d 658, 663 (Mo. banc 1993). Although BNSF made an oral motion to exclude Dr. Cunningham's testimony the morning of trial, the trial court overruled that motion and BNSF has not appealed the trial court's admission of Dr. Cunning-

ham's testimony.[9] Therefore, the issue of admissibility of Dr. Cunningham's testimony is not before this Court. "Admissibility should not be confused with submissibility." *Murrell v. State*, 215 S.W.3d 96, 112 (Mo. banc 2007). Because Dr. Cunningham's testimony was in the record, we must consider it in the light most favorable to Rice and afford Rice all favorable inferences that may be drawn from the evidence. *See Zibung v. Union Pac. R.R. Co.*, 776 S.W.2d 4, 5 (Mo. banc 1989). Viewed in this light, there was sufficient evidence under the liberal standards in FELA cases to show BNSF's negligence caused Rice's injuries.

### B. Foreseeability.

 "To satisfy the foreseeability element in a FELA case, the plaintiff must show that the railroad had actual or constructive notice of the defective condition that caused his injury." *Ramsey*, 130 S.W.3d at 651. Foreseeability is established by evidence that

(1) the railroad was responsible, through negligence, for the presence of the unsafe condition, or (2) the railroad had actual knowledge of its presence before the accident, or (3) the unsafe condition had continued for a sufficient length of time to justify an inference that failing to know about and remove it was due to lack of proper care.

*Id.* "The railroad's knowledge or anticipation of the possibility that a general danger is present and that its standard of conduct is inadequate to protect its employees from that harm is all that is required to satisfy this element." *Id.*

 Here, there was sufficient evidence under the liberal standards in FELA cases to show BNSF knew, or

9. "In FELA cases tried in state courts, the admission or exclusion of evidence is a procedural matter governed by the law of the forum state." *Clark v. Missouri & Northern Arkansas R.R. Co., Inc.*, 157 S.W.3d 665, 673 (Mo.App. W.D.2004).

should have known, that the injuries suffered by Rice were reasonably foreseeable based on BNSF"s failure to provide anti-vibration gloves, a working hydraulic spike puller, sufficient employees to perform assigned tasks, and failure to repair the Grove crane's defective guide wheel. "A jury's power to engage in inferences is considerably broader in FELA actions than in common law negligence suits." *Euton,* 936 S.W.2d at 150–51.

First, BNSF provided anti-vibration gloves to Rice in 1995, but failed to provide them to Rice when he requested them for doing similar work on the RP–13 rail gang. Additionally, BNSF recommended a hydraulic spike puller as the preferred method for pulling spikes, but failed to provide the RP–13 rail gang with one, even though Rice pulled spikes on a daily basis. Thus, a juror could conclude BNSF was responsible for Rice's repeated use of the claw bar to manually pull spikes. Importantly, there was also evidence regarding the strenuous nature of Rice's work and the added physical strain stemming from manually removing the spikes with a claw bar on a daily basis instead of using the recommended hydraulic spike puller. Furthermore, multiple complaints were made to supervisors regarding the manpower shortage on the RP–13 rail gang. This evidence provided a reasonable inference that this shortage resulted in increased physical work for Rice. Finally, evidence showed that BNSF roadmasters and mechanics were informed of the defective condition of the Grove crane guide wheel, but failed to correct it.

Therefore, there was sufficient evidence from which a jury could conclude BNSF knew, or should have known, that these conditions were inadequate to protect its employees from future harm.

## C. Statute of Limitations.

No action under FELA may be maintained unless it commenced within three years from the day the cause of action accrues. 45 U.S.C. § 56. In traumatic injury cases when the effects of the injury are immediately apparent, the cause of action accrues at that point, whether or not the full extent of the disability is known. *Fletcher v. Union Pac. R.R. Co.,* 621 F.2d 902, 906 (8th Cir.1980). In contrast, in occupational disease cases, the plaintiff alleges an on-going, continuous exposure to an occupational condition which accumulates and creates disability at a later date. Thus, where an injury accumulated unknowingly over time, the statute begins to run when the accumulated effects manifest themselves. *Sabalka v. Burlington Northern and Santa Fe Ry. Co.,* 54 S.W.3d 605, 609 (Mo.App. W.D. 2001). "A [FELA] claim accrues when the plaintiff knows or should know in the exercise of reasonable diligence the essential facts of his injury and its causes." *Id.* "Where the evidence shows that the pain was intermittent such that it would resolve with medicine and did not incapacitate the claimant, the claimant is not armed with critical facts of the injury." *Jones v. Kansas City Southern Ry. Co.,* 245 S.W.3d 834, 836 (Mo.App. W.D.2007).

Generally, the issue of whether a claim is barred by the statute of limitations is a question of law. However, when contradictory or different conclusions may be drawn from the evidence as to the date of accrual, it is a question of fact for the jury to decide. *Sabalka,* 54 S.W.3d at 609–10.

Rice's petition was filed on May 12, 2009, which means that the accrual date for the cause of action had to be on or after May 12, 2006, to avoid the statute of limitations. BNSF argues that because Rice admitted he may have told a co-worker his back hurt in 2002;[10] and told

---

**10.** Q. And you told Mr. Wadlow that you thought you had back problems due to your

Dr. Cunningham on March 5, 2008, "In retrospect, this has been a chronic problem for years. I worked for the railroad for years[,]" that these statements "establish [Rice]'s awareness that he was experiencing physical difficulties prior to the accrual date of May 12, 2006." We disagree and find, at most, Rice's date of accrual presented a question of fact for the jury to decide.

Rice testified he "didn't believe that [he] was injured for years." Additionally, Rice testified he first noticed his CTS symptoms in August or September 2007 when he began waking up at night with numbness and tingling in his hands. Those symptoms prompted him to see his primary care physician, Dr. Tegtmeyer, in January 2008. No evidence indicated Rice had seen or complained to any physician prior to January 2008 concerning any symptoms relating to his hands.

 Dr. Cunningham saw Rice, on referral from Dr. Tegtmeyer, on March 5, 2008. Dr. Cunningham's initial history revealed Rice's low back, lumbar pain had persisted for about six months. Rice's acknowledgment to Dr. Cunningham that in *retrospect* his back pain had gone on for years but had worsened in the last six months, does not establish the accrual date as possibly before May 12, 2006; the accrual date does not necessarily begin when a plaintiff first experiences pain. "[I]t is not enough to suspect a problem and a causal connection to start the statute of limitations ticking; one must either know of the problem and the probable connection or actively ignore a manifest problem which would be apparent to a reasonable person." *Reasons v. Union Pac. R.R. Co.*, 886 S.W.2d 104, 108 (Mo.App. E.D.1994). Additionally, Dr. Cunningham expressly testified regarding CTS that Rice "had

employment, isn't that right?

A. I don't think I told him I had back problems due to my employment. I may have

electrical findings suggesting that which fit with what he was telling me in history." In Dr. Cunningham's opinion, Rice's complaints, history, and electrical findings were consistent with the history, which was of only a six-month duration.

As such we find this evidence, at most, created a question of fact for the jury as to the accrual date of Rice's injuries.

Therefore, under the relaxed standard of proof in FELA cases, we find that Rice met his burden of presenting a case submissible to the jury, and sufficient evidence established that the accrual date of Rice's injuries was within three years of the date he filed his petition. This case is remanded for further proceedings consistent with this opinion.

BATES and SCOTT, JJ., concur.

told him my back hurt, but—